## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE P3 HEALTH GROUP HOLDINGS, LLC

)
)

Consol. C.A. No. 2021-0518-JTL

## ORDER DENYING MARY TOLAN AND GREG KAZARIAN'S MOTIONS TO DISMISS COUNT VI

1. Hudson Vegas Investment SPV, LLC ("Hudson") was a minority investor in P3 Health Group Holdings, LLC (the "Company"). In this litigation, Hudson has asserted various claims based on a transaction between the Company and a special purpose acquisition company, commonly known as a SPAC.

2. The defendants filed a surfeit of motions to dismiss on various grounds, including Rule 12(b)(6). The court has issued a decision addressing the breach of contract claims that Hudson asserted. Dkt. 172 (the "Contract Opinion," cited as "Op."). This order incorporates that decision by reference.

3. In Count VI of its complaint, Hudson has asserted a claim for bad faith breach of contract against Tolan and Kazarian on the theory that they received the equivalent of a bribe from Foresight. The Contract Opinion found that Hudson had plead viable claims for breach of contract against the Company. In Count VI, Hudson asserts that Tolan and Kazarian caused the Company to breach the LLC Agreement in bad faith, thereby incurring liability for themselves personally. Hudson relies on the bribe to support a pleading-stage inference that Tolan and Kazarian were pursuing their own interests.

4.	As described in the Contract Opinion, Chicago Pacific and the Company pursued a de-SPAC merger with Foresight, but that transaction became less attractive to the Company in April 2021. Op. at 11–12.

a.	An important aspect of the de-SPAC merger was the Company's ability to raise additional financing through the PIPE. Chicago Pacific principals handled nearly every aspect of the PIPE. The letter of intent contemplated a PIPE of $400 to $500 million. *Id.* at 11.

b.	In April 2021, the SPAC market began to weaken. JPMorgan warned Chicago Pacific that the PIPE would top out at $300 to $350 million, nearly one-third less than the letter of intent contemplated. *Id.*

c.	As April 2021 unfolded, the SPAC market declined further. By April 29, JPMorgan was telling Tolan that the maximum proceeds had fallen to $250 million. No one provided the information to the Board. Tolan decided to continue moving forward with the de-SPAC merger. *Id.* at 11–12.

d.	To shore up Chicago Pacific's commitment to the transaction, Wasson gave Tolan and Kazarian the opportunity to invest personally in a follow-on SPAC called Foresight Acquisition Corp. II. Tolan described the invitation as "an honor." *Id.* at 12. Without making any disclosure to the Board, Tolan and Kazarian accepted, and on May 7, 2021, they invested $500,000 and $100,000 in the follow-on SPAC. Based on historical rates of return to SPAC insiders, Tolan and Kazarian stood to reap nearly $9 million and $5 million, respectively, if the follow-on SPAC completed an acquisition. *Id.*

5.      The opportunity to invest in the follow-on SPAC looks like baksheesh. More provocatively, it could be called a bribe.

6.      It is reasonably conceivable that Tolan and Kazarian acted in bad faith in pursuing the de-SPAC merger because they were motivated to secure personal financial benefits.

7.      It is reasonably conceivable that Tolan and Kazarian caused the Company to breach its contractual obligations to Hudson because they were motivated to secure personal financial benefits.

8.      Tolan and Kazarian claim that they were entitled to accept the investment opportunity because the LLC Agreement authorized managers who represented significant investors, including the Chicago Pacific representatives, to consider whatever interests they deemed fit. The language states:

> Whenever in this Agreement . . . the Board . . . is permitted or required to take any action or to make a decision or determination, each Class A Manager and each Class D Manager shall be entitled to consider such interests and factors as such Class A Manager or Class D Manager, respectively, desires (including the interests of such Class A Manager's or Class D Manager's, respectively, Affiliates (including in their capacity as Members), employers, partners and their respective Affiliates) and, consistent with the elimination of any and all fiduciary duties, shall have no duty or obligation (whether express or implied) to take into consideration any other interests or factors.

Ex. 1 § 5.6(b). This is a common provision designed to ensure that managers affiliated with a specific fund need not focus solely on the best interests of the entity's residual claimants but rather can consider other interests, including the interests of their fund. *See Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *5–8 (Del. Ch. July

23, 2010) (dismissing claims for breach of contract and breach of fiduciary duty where an LLC agreement "preserved for [defendant] the freedom to withhold consent to Major Decisions involving Material Action if that was in its self-interest."). It does not say anything about accepting a bribe-like side payment in connection with an ongoing negotiation.

9. Tolan and Kazarian also claim that they were entitled to accept the investment opportunity because the LLC Agreement authorized the significant members and their affiliates to pursue other business interests, even if those interests competed with the Company. The operative language states:

> The Members expressly acknowledge and agree that . . .
>
> (i) each of the [Chicago Pacific] Members, Leavitt, the Class D Members, and each of their respective Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships with entities engaged in the Business other than through the Company or any of its Subsidiaries (an "Other Business"), . . .
>
> (iii) none of the [Chicago Pacific] Members, Leavitt, the Class D Members, nor any of their respective Affiliates will be prohibited by virtue of their respective investments in the Company or its Subsidiaries or their service as Managers or service on the Company's or its Subsidiaries' board of managers or directors from pursuing and engaging in any such activities,
>
> (iv) none of the [Chicago Pacific] Members, Leavitt, the Class D Members, nor any of their respective Affiliates will be obligated to inform or present the Company or its Subsidiaries or the Board of any such opportunity, relationship or investment, . . . and
>
> (vi) the involvement of any of the [Chicago Pacific] Members, Leavitt, the Class D Members, and/or any of their respective Affiliates in any Other Business will not constitute a conflict of interest by such Persons with respect to the Company or its Members or any of the Company's Subsidiaries.

*Id.* § 6.6(a). This is a standard provision designed to eliminate the entity opportunity doctrine that otherwise could limit the ability of fund investors to own businesses or pursue business opportunities that could compete with the company. *See* Martin I. Lubaroff, Paul M. Altman, Srinivas M. Raju, & Joshua J. Novak, *Delaware Limited Partnerships* § 14.05 at 14-114 (Supp. 2022) (discussing an analogous provision in a limited partnership agreement allowing a partner the "ability to pursue business opportunities for itself or otherwise compete with the business of the partnership"). It does not say anything about accepting a bribe-like side payment in connection with an ongoing negotiation.

10.     Count VI states a claim on which relief can be granted. The motion to dismiss Count VI is denied.

*/s/ J. Travis Laster*
Vice Chancellor Laster
November 2, 2022